YELLOW CAB COOPERATIVE ASSOCIATION, a Colorado corporation, Yellow Cab, Inc., a Colorado corporation, and Airport Limousine Service, Inc., a Colorado corporation, Plaintiffs-Appellants,

v.

COLORADO GROUND TRANSPORTATION CENTER, INC., a Colorado corporation, Defendant-Appellee.

No. 81CA0714.

Colorado Court of Appeals, Div. II.

June 24, 1982.

Rehearing Denied July 29, 1982.

Certiorari Denied Nov. 22, 1982.

I. H. Kaiser, P.C., I. H. Kaiser, Raule G. Nemer, Denver, for plaintiffs-appellants.

Kissinger & Lansing, P.C., Richard P. Kissinger, Carl Lansing, Denver, for defendant-appellee.

STERNBERG, Judge.

Yellow Cab Cooperative Association, Inc., (Yellow Cab) sought a preliminary injunction against Colorado Ground Transportation Center, Inc., (CGT) to enjoin CGT from arranging transportation for passengers deplaning at Stapleton International Airport. The basis for the action was the contention that one carrying on these activities was required to procure a certificate of authority from the Colorado Public Utilities Commission as a motor vehicle or common carrier. The trial court denied the injunction, finding that CGT was neither a common carrier nor a motor vehicle carrier within the meaning of §§ 40–1–102 and 40–10–101, C.R.S. 1973 (1981 Cum.Supp.) and, thus, did not need a certificate of authority. Yellow Cab appeals, and we affirm.

CGT arranges transportation for passengers deplaning at Stapleton International Airport by placing them with certified motor vehicle carriers licensed by the Colorado Public Utilities Commission. These passengers pay CGT a fee, CGT pays the carriers part of the fee, and keeps the balance. The rate charged depends on certain factors such as the number of persons traveling in a group, the number of small groups which could be brought together for travel to a common destination, the size of the vehicle large enough to accommodate the resulting groups, and the price charged by various common carriers operating similar types of motor vehicles which would accommodate the resulting group. It is undisputed that CGT does not own or operate any of the vehicles used for such transportation.

Section 40–10–101(4)(a), C.R.S.1973 (1981 Cum.Supp.), defines motor vehicle carrier as:

"[E]very person, lessee, trustee, receiver, or trustee appointed by any court whatsoever *owning, controlling, operating, or managing any motor vehicle* used in serving the public in the business of the transportation of persons or of property . . . for compensation as a common carrier over any public highway . . . ." (emphasis supplied)

Section 40–1–102(3), C.R.S.1973 (1981 Cum. Supp.) defines common carrier as:

"[E]very person, directly or indirectly affording a means of transportation, or any service or facility in connection therewith, within this state by railroad, motor vehicle, aircraft, or other vehicles whatever *by indiscriminately accepting and carrying* for compensation passengers or property . . . ." (emphasis supplied)

■ Although not controlling, an agency's interpretation of statutes relating to its field of regulation are entitled to careful scrutiny. *See Travelers Insurance Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1978). The case of *Re Duffy,* 9 Colo.P.U.C. 485 (1932) construed statutory language similar to that involved here and determined that those who merely secure passengers desiring to make trips as paying guests for pri-

vate parties planning motor vehicle trips were not functioning as a public utility warranting regulation by the commission. *See Colo.Sess. Laws* 1931, ch. 120, § 1(h), at 466–67. But, *Duffy* holds that if those who carried passengers were not properly certified as common or private carriers, then those who solicited customers do violate the law by aiding and abetting the uncertified operators. While this commission's interpretation is quite old, we find the reasoning persuasive under our statute and therefore follow it.

■ Yellow Cab argues that, contrary to *Duffy*, the proper analysis includes whether CGT was "holding out" to the public as being in the business of providing a transportation service. "Holding one's self out" became an element of a special act which initially regulated motor vehicle common carriers. *Colo.Sess. Laws* 1927, ch. 134, § 1(d) at 500. However, the "holding one's self out" language was deleted four years later. *Colo.Sess. Laws* 1931, ch. 120, § 1(h) at 466–67. The current statute requires the common carrier to accept and carry passengers or property without discrimination. Section 40–1–102(3), C.R.S.1973 (1981 Cum. Supp.). We may not stretch the meaning of the statute where its meaning is plain and nothing appears to evidence a contrary legislative intent. *City & County of Denver v. Howard*, Colo., 622 P.2d 568 (1981); *Alonzi v. People*, 198 Colo. 160, 597 P.2d 560 (1979).

Yellow Cab compares the situation here to several cases from other states concerning freight forwarders. *See, e.g., Kettenhofen v. Globe Transfer & Storage Co.*, 70 Wash. 645, 127 P. 295 (1912). However, we reject such analogy. While a freight forwarder assumes total control of the goods to be shipped until delivery to the destination point, CGT undertakes no responsibility after the passengers are placed with a carrier.

In effect, CGT is a broker of travel arrangements and Colorado, unlike many oth-

er states, *see, e.g., Cal.Pub.Util.Code* § 4801, et seq. (West 1975), has not enacted legislation expressly regulating the activities of those who arrange transportation for others.

The order is affirmed.

PIERCE and BERMAN, JJ., concur.