Black Diamond Development, Inc. ("BDD"), appeals from a judgment in favor of Patrick G. Thompson, in Thompson's breach-of-contract action against BDD. We affirm.
 I. Factual Background
On May 19, 1997, the parties in this case executed a document purporting to be an "Agreement for Purchase of Interest" in a condominium "development project in Mt. Crested Butte, Colorado," which BDD was contemplating at that time (hereinafter referred to as "the sell-back agreement"). The sell-back agreement stated, in pertinent part:
 "In consideration of cash value received from Patrick G. Thompson . . . in the amount of $38,000.00, . . . Black Diamond Development, Inc., does hereby sell a two percent (2) interest of the net proceeds or profit from the condominium project to be built in Mt. Crested Butte, Co. In the event the purchaser desires to sell-back his interest, during the construction process, he may do so by giving a thirty day written notice and will receive his principle [sic] investment, plus fifteen percent interest (15% APR) calculated from the date of this agreement."
(Emphasis added.) The sell-back agreement was signed by Thompson and by Steve McCay, as president of BDD.
The next day, Thompson sent BDD $38,000 (hereinafter referred to as "the first installment"). McCay used the money to reimburse himself for his expenditures in procuring engineering reports, soil tests, and plans and specifications, and in traveling in connection with the contemplated condominium-development project. On July 8, 1997, Thompson sent BDD an additional $62,000 (hereinafter referred to as "the second installment"). McCay used the money from the second installment in a manner similar to the first installment. Both transactions were brokered by Gordon Berlant, who is not a party in this case.
In conjunction with the second installment, Thompson and BDD executed a second document purporting to evidence the parties' agreement as to their respective rights and responsibilities arising out of BDD's receipt and use of the $62,000 (hereinafter referred to as "the July document"). The parties have been unable to produce the original of the July document,or even a legible copy of the original. In the only copy produced in this case, approximately one-third of the text is illegible.
BDD never broke ground on the condominium project. According to McCay, the project was ultimately abandoned when another developer purchased property in Mt. Crested Butte that BDD considered key to the financial success of the project. On April 8, 2004, Thompson wrote a letter to McCay; that letter stated, in pertinent part:
 "Promise was made on agreements dated May 19, 1997, for an investment in the amount of $38,000.00 and an additional installment in the amount of $62,000.00 dated July 8, 1997, which totaling $100,000.00, would . . . culminate into owning 5.5% interest in the Mt. Crested Butte, Co., project. I hereby request to have my principal investment of $100,000.00 plus 15% interest per year (15% APR) calculated from the date of the agreement to be returned to me. You have 30 days to fulfill your obligation based on the term[s] of the agreement." *Page 50 
(Emphasis added.) On July 27, 2004, Thompson sued BDD, alleging breach of contract and seeking damages in the amount of $206,259.96. Specifically, he sought the return of the $100,000 principal, plus interest at the rate of 15%. The case was tried without a jury on the basis of documentary evidence and oral testimony.
At trial, counsel for BDD objected to introduction of the July document, arguing that, because of its illegibility, it had no probative value. More specifically, he stated:
 "When I received the complaint, my first response was, I sent him a letter asking him for a better copy because I could not read it. And if you look at [it], you cannot read it either. I cannot tell whether — I cannot tell who is — or who would owe who, or if it was only supposed to be repayment in the event the project took off or made any money. You cannot tell. You can see bits and pieces of it, but you cannot tell from that [document] what happened."
The trial court stated: "I will overrule your objection and accept it for whatever it is worth. Whether I can read it or not remains to be seen, I suppose." (Emphasis added.) Ultimately, the trial court awarded Thompson $235,950, which included the principal and interest thereon at the rate of 15% through the date of the judgment, and BDD appealed.
As BDD frames the issues on appeal, this Court is faced with two issues. The threshold issue concerns the construction of a key phrase in the sell-back agreement relating specifically to the first installment. An issue regarding recovery of the second installment arises only if the phrase in the sell-back agreement is construed adversely to BDD.
 II. Construction of the Sell-Back Agreement
It is undisputed that the parties agreed that Thompson would be entitled to repayment of his first installment of $38,000, plus interest at the rate of 15%, if his request for repayment was made "during the construction process." In other words, it is undisputed that Thompson would be entitled to repayment of his first installment at 15% interest if the sell-back agreement was triggered by BDD's work in procuring engineering reports, soil tests, and plans and specifications, and in traveling in connection with the contemplated condominium-development project. BDD, however, contends that the sell-back agreement was never triggered, because, it insists, "construction" on the project was never begun. According to BDD, the phrase "during the construction process" does not include such activities as procuring engineering reports, soil tests, and plans and specifications, and traveling. The resolution of this issue thus involves a matter of contract construction.
"`[W]e apply a de novo review to a trial court's determination of whether a [written] contract is ambiguous and to a trial court's determination of the legal effect of an unambiguous contract term.'" Young v. Pimped,882 So.2d 828, 830 (Ala. 2003) (quoting Winkleblack v.Murphy, 811 So.2d 521, 525-26 (2001)). "[A] contract is not ambiguous simply "`because the parties allege different constructions of [it]."'" Avis Rent A Car Systems, Inc. v.Heilman, 876 So.2d 1111, 1122 (Ala. 2003) (quoting Exparte University of South Alabama, 812 So.2d 341,345 (Ala. 2001), quoting in turn Yu v. Stephens,591 So.2d 858, 859 (Ala. 1991)). A contract is ambiguous only if it is "susceptible of more than one reasonable meaning,"FabArc Steel Supply, Inc. v. Composite Constr. Sys.,Inc., 914 So.2d 344, 357 (Ala. 2005) (emphasis added), and "`it is presumed that parties intend to makereasonable contracts.'" BellSouth Mobility, Inc.v. Cellulink, Inc., *Page 51 814 So.2d 203, 216 (Ala. 2001) (quoting Weathers v.Weathers, 508 So.2d 272, 274 (Ala.Civ.App. 1987) (emphasis added in Cellulink)).
According to BDD, the phrase is not ambiguous, and we agree, although we disagree with BDD's interpretation of it. BDD argues that the verb "construct" means "`to form by assembling or combining parts; build.'" BDD's brief, at 18 (quotingThe American Heritage Dictionary 394 (4th ed. 2006)). Because no ground was ever broken on the condominium-development project, BDD insists, construction never began; therefore, BDD argues, the sell-back agreement was never triggered.
However, BDD ignores the second word in the phrase, "process," which The American Heritage Dictionary defines as "[a] series of actions, changes, or functions bringing about a result." Id. at 1398. The parties did not use the phrase "during construction," or even "during the constructionphase"; they used the phrase "during the constructionprocess." (Emphasis added.) See generally Kweku Bentil, Fundamentals of the Construction Process 6 (1989) (the "construction process" is ordinarily composed of five phases, including (1) "pre-bid," (2) "contract procurement," (3) "contract award," (4) actual "construction," and (5) "operating and maintenance"). The word "process" must be regarded as adding something of substance to the phrase. Courts will not presume that the parties "make use of words in their contracts to which no meaning is attached by them."McGoldrick v. Lou Ana Foods, Inc., 649 So.2d 455, 458
(La.Ct.App. 1994). In other words, "parties to a contract will not be imputed with using language that is meaningless or without effect." Id. See also Royal Ins. Co. ofAmerica v. Thomas, 879 So.2d 1144, 1154 (Ala. 2003) ("`It being presumed that every condition was intended to accomplish some purpose, it is not to be considered that idle provisions were inserted. Each word is deemed to have some meaning, and none should be assumed to be superfluous.'" (quoting Hallv. American Indem. Group, 648 So.2d 556, 559 (Ala. 1994))). The use of the word "process" broadens the scope of the phrase in the sell-back agreement.
Indeed, courts have stated that the term "construction process includes more than bricks and mortar," and that "the term `construction delays' . . . is broad enough to include design, planning, and other facets of bringing the [project] to fruition." Brewhouse, Ltd. v. New Orleans Pub. Serv.,Inc., 614 So.2d 118, 124 (La.Ct.App. 1993). For example, acquiring a "`permanent first mortgage loan'" is an essential part of the "`construction process, because it finances a substantial proportion, if not all, of the cost of development, including site preparation and sometimes the actual cost of acquiring the raw land.'" Bonniecrest Dev.Co. v. Carroll, 478 A.2d 555, 559 n. 5 (R.I. 1984) (quoting Hershman, Permanent Financing, 1 Modern Real Estate Transactions, 455-56 (4th ed. 1983) (emphasis added)). Had the parties intended to tie the provision in the sell-back agreement to the actual construction phase of the condominium-development project, they could easily have said so.
Adopting BDD's litigation position would lead to the result that BDD, having received $38,000 from Thompson — whether as a loan, as Thompson regards it, or as an investment, as BDD does — could simply abandon work on the project priorto commencement of actual construction and keep the $38,000without any liability to Thompson. Nothing in the sell-back agreement suggests that the parties intended such an unreasonable result. Thus, we agree with Thompson that the sell-back agreement encompasses the earlier *Page 52 
phases of the "construction process," including the procurement of engineering reports, soil tests, and plans and specifications, and travel in connection with the contemplated condominium-development project. Consequently, the trial court did not err in holding that Thompson was entitled to recover the amount of his first installment with interest at the rate of 15%.
 III. The Second Installment
Judgment for the entire $100,000 paid under both
installments was proper only if, as the trial court evidently found, the parties had agreed that Thompson could recover the $62,000 he paid in the second installment under the same terms as the first installment. As we previously noted, however, payment of the second installment was accompanied by a writing that is substantially illegible.
Ordinarily, "the best evidence of [the] intent [of the parties] is the [written] contract itself; if an agreement is `complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'" EternityGlobal Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,375 F.3d 168, 177-78 (2d Cir. 2004) (quoting Greenfield v.Philles Records, Inc., 98 N.Y.2d 562, 569,750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002)). However, "`[w]hen the parties undertake to put their agreement in writing and express its crucial terms by characters or symbols so illegible
that the tribunal established to try the facts cannot determine the signification of that which is on the paper, then no contract in writing has been made.'" 11 Richard A. Lord, Williston on Contracts § 31:13 (4th ed. 1999) (quoting Aradalou v. New York, N.H. H.R.R., 225 Mass. 235, 240, 114 N.E. 297, 299 (1916) (emphasis added)).
In this case, as we have already stated, approximately one third of the July document is illegible, and BDD contested its very admission on that ground. In fact, at least three lines of crucial text are virtually nonexistent.
Neither party disputes the existence of a contract
between BDD and Thompson in relation to the second installment. Nor is there any dispute as to its essential terms. The parties agree, for example, that Thompson paid $62,000 in return for an additional 3.5% interest in the condominium-development project. The parties disagree only as to whether Thompson could elect to recover his payment under the same terms as those expressed in the sell-back agreement. Thus, the second installment involved essentially an oral contract.
"The terms of an oral contract can be established through [parol] evidence, and a determination of those terms is for the trier of fact." Comstock Constr, Inc. v. SheyenneDisposal, Inc., 651 N.W.2d 656, 661 (N.D. 2002) (emphasis added). See Linton v. E.C. Cates Agency, Inc., 113 P.3d 26, 30 (Wyo. 2005) ("The terms and conditions of [an] oral contract and the intent of the parties are generally questions of fact."). To resolve the disputed sell-back issue relating to the second installment, the trial court was required to, and did, receive oral testimony as to the intent of the parties.
It is well established that "[w]hen a trial court hears oretenus testimony `its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.'" New Props., L.L.C. v. Stewart,905 So.2d 797, 799 (Ala. 2004) (quoting Philpot v.State, 843 So.2d 122, 125 (Ala. 2002)).
The trial court's judgment comports with this rule. Thompson testified that *Page 53 
the $62,000 payment was the second part of a two-part loan he was making to BDD. He testified that the "contract stipulated" that he was entitled to a return of $100,000 at 15% interest. McCay himself testified that he understood he was receiving the second installment "under the sameterms" as the first installment. (Emphasis added.)
BDD contends that the first installment and the second installment relate to entirely separate agreements and argues that "the parties . . . could have included the sell-back provision in the [July document] if that was their intention." BDD's brief, at 39. We do not agree with this argument about what the July document does not contain. In fact, because of the condition of that document, no assertion as to what it does or does not contain can be verified. Under the disputed facts as developed in the trial of this case, the judgment was not "palpably erroneous or manifestly unjust."
In conclusion, the sell-back agreement was unambiguously triggered by the procurement of engineering reports, soil tests, and plans and specifications, and travel in connection with the contemplated condominium-development project. Thompson was clearly entitled to recover the $38,000 first installment with interest at the rate of 15% under that written agreement. Also, BDD has not demonstrated that the trial court erred in awarding the $62,000 second installment with interest at the rate of 15%. For these reasons, the judgment is affirmed.
AFFIRMED.
COBB, C.J., and SEE, SMITH, and PARKER, JJ., concur.